UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVSIION

| | | |
|---|---|---|
| DUANE HIPP, | ) | CASE NO. 1:17-CV-0846 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA PEARSON |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | THOMAS M. PARKER |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

**I.      Introduction**

Plaintiff, Duane Hipp, seeks judicial review of the final decision of the Commissioner of

Social Security denying his application for disability insurance benefits ("DIB") under Title II of

the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g),

42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supports the ALJ's decision and because Hipp has failed to

identify any error of law in the ALJ's evaluation of his claim, I recommend that the final

decision of the Commissioner be **AFFIRMED**.

**II.      Procedural History**

Hipp first filed for DIB on November 18, 2010 alleging a disability onset date of

November 27, 2006.  (Tr. 80-81)  His first application was denied initially on January 10, 2011

and on reconsideration in May 2011.  (Tr. 36-37, 39)  On January 24, 2013, Hipp filed a second

application for DIB alleging again that his disability began on November 27, 2006.  (Tr. 214-

221)  This application was denied initially on February 1, 2013 (Tr. 40-41) and on

1

reconsideration on June 28, 2013. (Tr. 44-45) Administrative Law Judge ("ALJ") Edmund Round who dismissed Hipp's application on July 23, 2014 on *res judicata* grounds. (Tr. 31-32) Hipp requested a review of that decision, and on November 15, 2016, the Appeals Council vacated the dismissal and remanded Hipp's application for a hearing. (Tr. 34-35)

ALJ Pamela Loesel heard the case on April 20, 2016. (Tr. 361-406) On June 20, 2016, she issued a decision finding Hipp was not disabled between November 27, 2006, the alleged onset date, and June 30 2010, the date last insured. (Tr. 14-27) The Appeals Council denied Hipp's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 5-7) Hipp now seeks judicial review. (ECF Doc. 1)

## III.   Evidence

### A.   Personal, Educational and Vocational Evidence

Hipp was born on June 4, 1954 and was 52 years old on his alleged onset date. (Tr. 80) He has a high school education and past relevant work as an electrician. (Tr. 96)

### B.   Medical Evidence

Because there is no dispute between the parties that Hipp has suffered from chronic foot and knee pain from his alleged disability onset date to his date last insured, I conclude that a chronological description of the medical evidence would be the most efficient way to trace the progression of his impairments and the many steps he took to obtain treatment for those conditions. Much of the record evidence originally was developed for Hipp's workers' compensation claim.

On November 22, 2006, Hipp twisted his left foot when coming down stairs. (Tr. 115) X-rays of his foot and ankle showed arthritis of the first metatarsophalangeal joint and plantar fasciitis. (Tr. 115, 224) A left foot MRI on December 6, 2006 showed generalized tenosynovitis

2

along the medial and posterolateral tendons of the ankle mortise, small to moderate joint effusion, and edema of the Achilles.  (Tr. 115, 223)  Physical examination revealed pain, edema, and infiltration of the musculotendinous junction of the Achilles.  Hipp attended physical therapy from December 19, 2006 to March 6, 2007.  (Tr. 118-122)

Hipp met with Dr. Anschuetz, an orthopedic surgeon, on January 8, 2007, complaining of pain with difficulty standing and walking.  (Tr. 133)  Dr. Anschuetz ordered a bone scan, which was performed on January 10, 2007.  The bone scan showed degenerative changes and abnormalities involving the soft tissues of the left foot plantar aspect at the mid to hind-foot region, with no definite bony abnormality.  (Tr. 132)  Dr. Anschuetz ordered immobilization and recommended a CamWalker boot.  (Tr. 130)  On March 27, 2007, he also recommended foot elevation and stated that Hipp was temporarily totally disabled.  (Tr. 126)  On May 14, 2007, Dr. Anschuetz told Hipp to continue wearing the air cast boot, but that he could stop elevating his leg.  (Tr. 124)

Hipp met with Dr. Cohn, another orthopedic surgeon, on July 25, 2007.  Dr. Cohn observed bruising, swelling, and tenderness of the left lower extremity.  Dr. Cohn prescribed new medication and continued the walking boot.  (Tr. 218)  Hipp met with Dr. Cohn again on August 15, 2007.  He complained of pain and swelling.  (Tr. 141)  Dr. Cohn reviewed x-rays and an MRI that were mostly unremarkable but revealed a small anterior bone spur on the tibia and joint effusion along the posteromedial and posterolateral joint lines.  (Tr. 141, 305)  Dr. Cohn considered a cortisone shot, continued Hipp's walking boot and told him to remain off work until the next visit.  (Tr. 142)  Hipp followed-up with Dr. Cohn on August 29, 2007.  (Tr. 139)  Dr. Cohn noted tenderness along the lateral aspect of the left foot.  He advised Hipp to stay off work until the next visit.  (Tr. 139-140)  Dr. Cohn's findings were the same on September 28, 2007.

3

(Tr. 137-138)  Dr. Cohn diagnosed Hipp with left foot tendinitis, left foot sprain, and left foot mid-tarsal degenerative joint disease.  (Tr. 138)  An MRI of Hipp's left ankle on October 8, 2007 showed mild and minimal findings.  (Tr. 206-207)  On October 15, 2007, Hipp was told to begin weaning himself from the walking boot.  (Tr. 204)  On December 14, 2007, Dr. Cohn noted normal strength and sensation, with 20 degrees of plantar flexion and 15 degrees of dorsiflexion. (Tr. 290)  Hipp was told to continue weaning himself from the boot.  (Tr. 203)

Plaintiff met with orthopedic surgeon William Saar, D.O., on October 29, 2007.  He found Hipp hypersensitive to touch in the foot and ankle region.  Dr. Saar observed swelling, limited range of motion, tenderness and decreased strength in eversion.  (Tr. 325)  Dr. Saar described Hipp's diagnosed conditions as mild and recommended conservative treatment.  (Tr. 326)

Ryan Tedrick, a physical therapist, performed a physical work performance evaluation on January 8, 2008.  (Tr. 285-289)  Mr. Tedrick concluded that Hipp had the capacity to perform work at the medium exertional level.  (Tr. 289)

In January 2008, Dr. Cohn treated Hipp for left foot pain, pressure, numbness, and tingling.  (Tr. 199)  A February 21, 2008 MRI showed chronic high grade tearing of the peroneus brevis tendon, chronic moderate peroneus longus tendinosis, mild peroneal and posterior tibial tenosynovitis, and chronic sprain of the spring ligament.  (Tr. 194)  On March 5, 2008, Dr. Cohn told Hipp to remain off work and to return to Dr. Saar.  (Tr. 191-192)

On May 15, 2008, Dr. Saar performed an exploration and debridement of Hipp's left peroneal tenosynovitis removing low-lying muscle belly.  (Tr. 319-320)  Hipp followed-up with Dr. Saar on September 29, 2008.  By then, Hipp had developed knee pain secondary to gait

changes and abnormalities.  (Tr. 186)  An left knee MRI was normal, and Dr. Saar recommended that Hipp consult with a pain management specialist.  (Tr. 184)

Hipp returned to Dr. Cohn on February 9, 2009 for his knee pain.  (Tr. 180)  Physical examination showed slight tenderness and patellofemoral crepitation.  Hipp was diagnosed with chondromalacia of the patella and left knee chondrosis of the lateral compartment.  (Tr. 181)  An x-ray later in March showed that joint spaces were maintained and there were no arthritic changes in Hipp's knees.  (Tr. 174)

On May 27, 2009, Dr. Cohn noted that Hipp ambulated with a limp.  (Tr. 172)  Dr. Cohn diagnosed left knee chondrosis and returned Hipp to work with some restrictions.  (Tr. 173)  A left knee MRI on June 3, 2009 showed mild degenerative signal abnormality of both medial and lateral menisci, but no evidence of articular surface tear; mild diffuse cartilage thinning; small amount of joint fluid; and a tiny cyst or enchondroma of the proximal tibial metaphysis.  (Tr. 170)  On June 19, 2009, Hipp complained of pain with standing and putting pressure on the knee. He noticed swelling when he walked for long periods.  Dr. Cohn told Hipp he could continue his light duty work with knee restrictions until his next visit.  (Tr. 168-169)

Physical therapist Jonathan Strychasz completed a functional capacity evaluation on July 8, 2009.  (Tr. 157-160)  Test findings showed that Hipp provided full physical effort and his reports of pain and disability were considered reasonable and reliable.  (Tr. 157-158)  The evaluator found that Hipp continued to have a restricted range of motion through his left foot and ankle; decreased peroneal/gastroc/soleus strength and left knee pain chondromalacia.  (Tr. 159) He recommended more aggressive treatment and concluded that Hipp could lift a maximum of 40 pounds; sit, stand and walk up to one-third of the day; occasionally bend and stoop; but could never balance on the left leg, crouch or squat.  (Tr. 159-160)

On August 18, 2009, Hipp met with Dr. Teresa Dews for pain management of the left leg and foot pain.  (Tr. 166)  Hipp complained of aching pain, throbbing and feeling unstable in his left knee.  (Tr. 166)  Hipp reported that in his Functional Capacity Evaluation he was "severely limited." (Tr. 251)  He was not using an assistive device and forced himself to be fairly active despite pain.  He had normal sensation except over a surgical scar.  He had decreased range of motion in his left ankle, 4/5 left plantar flexion, and did not meet the criteria for complex regional pain syndrome.  (Tr. 253)

In August 2009, Hipp told Dr. Cohn that his knee pain had worsened from 6/10 to 9/10 during an office visit.  (Tr. 164)  In September 2009, he rated his knee pain as 5/10.  He continued to work light duty but was unable to squat or use stairs.  Examination showed quadriceps atrophy and tenderness, but his knee was stable and sensation was normal.  (Tr. 162)

Hipp met with Dr. Seeds, an orthopedic surgeon, on October 20, 2009 for left knee and foot pain.  (Tr. 280-284)  A left knee MRI on November 13, 2009 revealed moderate chondromalacia patellae and a low grade partial tear of the ACL.  (Tr. 278)  An EMG of Hipp's left leg on December 21, 2009 showed electrodiagnostic evidence of severe sural nerve injury. (Tr. 250)

On January 19, 2010, Hipp told Dr. Dews that minimal increases in activity caused severe pain.  Hipp told her he only rarely took OxyContin for his pain.  Dr. Dews found pitting edema in both lower extremities, decreased sensation in the left foot, and positive hyperalgesia. The subjective portion of her notes stated that Hipp was still "moderately to severely functionally impaired" due to his pain.  (Tr. 245)  On February 18, 2010, Dr. Dews prescribed Neurontin and noted that a repeat MRI was scheduled for further consideration of surgery.  (Tr. 242)

On February 19, 2010, a left foot MRI was normal except Dr. Seeds believed there was possible scarring of the tendon.  (Tr. 264-265)  These findings were consistent with conservative management.  (Tr. 265)

Hipp met with Mark Berkowitz, DPM, on April 27, 2010 for his painful left foot and ankle.  (Tr. 228)  Hipp had decreased range of motion of the ankle and subtalar joints, pain and a slight decrease of the medial arch.  Dr. Berkowitz applied tape and considered an ankle brace. On May 4, 2010, Hipp reported that the tape improved his foot pain, but his knee was probably worse.  Hipp reported that he was able to do all his normal daily activities with slightly less discomfort.  Dr. Berkowitz diagnosed peroneal tendonitis and capsulitis.  He provided a custom molded insert and night splint.  (Tr. 227)  On September 28, 2010, Hipp told Dr. Berkowitz that the custom insert was irritating his foot and he was waiting for knee surgery.  (Tr. 226)

On June 1, 2010, Dr. Dews found lower extremity edema, decreased range of motion in the left ankle, some increased swelling on the left side compared to the right, and some mild hyperalgesia in the left lateral aspect of the foot.  (Tr. 236)

On July 17, 2010, Dr. Seeds noted that Hipp continued to describe instability with catching and locking of the left lower extremity.  Dr. Seeds planned on performing an arthroscopy when approved by workers' compensation.  (Tr. 262)

On July 27, 2010, Hipp returned to Dr. Dews for pain management due to continuing knee pain.  (Tr. 233)  Hipp reported that he could not sit for extended periods and was using ice on his foot for relief.  He felt that Lyrica was a positive change.  Dr. Dews noted that Hipp was waiting for his knee surgery and then would proceed with a chronic pain rehabilitation program. On October 21, 2010, Dr. Dews diagnosed tenosynovitis of the foot and ankle and concluded that

Hipp's pain was intractable, but stable. (Tr. 230) Standing, walking and positioning aggravated his pain. (Tr. 232)

On November 8, 2010, Dr. Seeds reported that Hipp continued to have significant pain and difficulty with post-surgical changes of the tendon debridement. (Tr. 259)

### C.    Relevant Testimonial Evidence

#### 1.    Hipp's Summarized Testimony

- Hipp described his abilities between 2006 and 2010. During that time, his wife did most of the chores and shopping. He was able to do limited shopping and was able to drive. (Tr. 370-374)

- He used crutches on and off during that period. He rarely met with friends. He watched racing on TV and attended one race. (Tr. 374-375)

- Hipp was able to walk 20 to 30 minutes, but then needed to sit for up to 45 minutes with ice on his foot, elevating it above his heart level. (Tr. 384-385)

- Hipp had not worked since the date of his injury on November 27, 2006. He previously worked as an electrician, journeyman inside wireman. (Tr. 376)

- Hipp underwent vocational rehab and applied for some electrical supervisory positions, but he did not obtain other employment. He received benefits through workers' compensation until 2016. (Tr. 376-380)

#### 2.    Vocational Expert – Carol Mosley

Carol Mosley, a vocational expert ("VE"), also testified. (Tr. 396-404)

- Hipp's past work was an electrician. (Tr. 397)

- Ms. Mosley testified that Hipp had acquired transferable skills, but that the skills would not transfer to sedentary work. (Tr. 397-398) Ms. Mosley identified two skilled jobs that Hipp could perform in response to the ALJ's light residual capacity finding. (Tr. 401-402)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .[1]
>
> 42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

*Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform work available in the national economy.  *Id.*

**V.      The ALJ's Decision**

On June 20, 2016, the ALJ decided:[2]

1.  Mr. Hipp last met the insured status requirements of the Social Security Act
    on June 30, 2010.  (Tr. 16)

2.  Hipp did not engage in substantial gainful activity during the period of time
    between the alleged onset date of November 27, 2006 and June 30, 2010.  (Tr.
    16)

3.  Through the date last insured, Hipp had the following severe impairments:
    osteoarthritis of the left foot and ankle tenosynovitis of the left foot and ankle,
    s/p tear peroneus brevis tendon left foot, chondromalacia patellae of the left
    knee and obesity.  (Tr. 16)

4.  Hipp's impairments did not meet or medically equal the severity of any listed
    impairment.  (Tr. 17)

5.  Hipp had the residual functional capacity to perform light work except he was
    able to occasionally lift and carry 20 pounds and frequently lift and carry 10
    pounds; he could stand and walk 6 hours in an 8 hour workday; he had unlimited
    ability to push and pull other than his limitations for lift and carry; he could
    occasionally climb ramps and stairs; could never climb ladders, ropes and
    scaffolds; and could occasionally balance, stoop, kneel, crouch and crawl.  (Tr.
    17)

6.  Through the date last insured, Hipp was unable to perform any past relevant
    work.  (Tr. 26)

7.  Hipp was born on June 4, 1954 and was 56 years old, defined as an individual
    closely approaching advanced age, on the date last insured.  (Tr. 26)

8.  Hipp had at least a high school education and was able to communicate in English.
    (Tr. 26)

9.  Hipp had acquired work skills from past relevant work.  (Tr. 26)

---

[2] This is a paraphrase of the ALJ's decision.

10. Considering Hipp's age, education, work experience, and residual functional capacity, he had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy.  (Tr. 26)

The ALJ determined that Hipp was not under a disability at any time from November 27, 2006, the alleged onset date, to June 20, 2010, the date last insured.  (Tr. 27)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied.  If not, reversal is required unless the legal error is harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B.      Residual Functional Capacity Supported by Substantial Evidence

Hipp's only argument is that the ALJ failed to support her RFC determination with substantial evidence, in part because the record was incomplete (due to the lack of a medical

RFC assessment).  But Hipp also argues that the ALJ committed legal error "by exercising medical expertise she did not have in interpreting raw medical data."  ECF Doc. 13, Page ID# 62.  The RFC defines an individual's work-related abilities despite his or her limitations.  See 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  See 20 C.F.R. § 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  See 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p, 1996 SSR LEXIS 5.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before [her]' when [she] 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to [her].")).  *See also* SSR 96-8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  See *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ supported her RFC finding by substantial evidence.  The ALJ considered all of the medical evidence in the record, including evidence that could be construed as medical opinions, explaining the weight assigned to these opinions and her reasoning for that weight. The ALJ assigned some weight to each of the physical therapists[3] who assessed Hipp's physical capacity.  The ALJ actually found that Hipp was more limited than the findings of Ryan Tedrick, one of his physical therapists, who had concluded Hipp was capable of medium exertional level work.  The ALJ concluded that the evidence showed that Hipp was only capable of performing light work.

The ALJ also considered opinions from Hipp's treating physicians.  The ALJ decision stated: "On January 20, 2010, Dr. Dewes [*sic*] stated that the claimant was moderately to severely functionally impaired due to his left lower extremity pain (Ex. 9F/17)."  (Tr. 25) However, the ALJ assigned only limited weight to this opinion because she concluded it was vague, was not part of a residual functional capacity evaluation, and did not contain specific limitations.  (*Id.*)  I conclude there was no error in the ALJ's assessment of Dr. Dews' opinion. An examination of the treatment note the ALJ cited, Exhibit 9F, page 17 (Tr. 245), reveals it was simply a progress note regarding Hipp's return to the office to review results of an EMG study. Dr. Dews stated, under the heading "SUBJECTIVE":

> Since the last evaluation his medical history has not changed.  I have reviewed the nurses notes and I am aware of the family/social history.  He is still moderately to severely functionally impaired due to the pain.  Reports that minimal increases in activity cause severe pain.  He current takes not [*sic*] pain medication.  Used the Oxycontin only rarely.

*Id.*  On its face, this record does not make it clear that the quoted language is Dr. Dews' opinion or merely a subjective report from Hipp.  But the progress notes from that "last evaluation,"

---

[3] The ALJ assigned some weight to these opinions despite the fact that physical therapists are not technically "acceptable medical sources."  (Tr. 24)

sheds light on this issue.  Hipp's next closest visit to Dr. Dews' office occurred on August 18, 2009, when he "present[ed] to The Cleveland Clinic Foundation's Pain Management Center at Hillcrest Hospital for the evaluation of his left leg and foot pain."  (Tr. 251)  The record contains Hipp's description of how he was injured and then states: "Functional Capacity Evaluation (severely limited) per patient."  (*Id.*).  Thus, it appears the ALJ reasonably concluded that Dr. Dews' statement in her January 2010 record was not the result of a functional capacity evaluation she had made but was, instead, a recounting of something Hipp had told her.

I conclude that the ALJ did not err in her assessment of the medical evidence.

### C.      Interpreting Raw Medical Data

Hipp also argues that the ALJ erred by interpreting "raw medical data" that had not been reviewed by a medical expert.  ECF Doc. 13, Page ID# 62.  Hipp cites several cases including *Meece v. Barnhart,* 192 F.App'x 456, 465 (6th Cir. 2006) in support.  However, in several of Hipp's cases, including *Meece*, ALJs had improperly displaced the findings of treating physicians with their own medical judgments.  *Id.* at 464-465.  "[N]one of these cases [] suggests that an ALJ must, as a matter of law, seek out a physician's medical opinion where one is not offered."  *Brown v. Comm'r of Soc. Sec.,* 602 Fed. App'x 328, 331 (6th Cir. 2015)).

Here, the only opinion evidence that Hipp points to is the treatment note from Dr. Dews.  ECF Doc. 13, Page ID# 63.  But, as discussed above, the ALJ properly considered that note and decided that it did not contain specific limitations related to the ALJ's RFC determination.  I agree with the ALJ's analysis, for the reasons discussed above.  There is nothing to indicate that Dr. Dews' note regarding Hipp's functional impairment was her own opinion rather than Hipp's subjective report.  There is nothing to support the conclusion that the ALJ substituted her opinion

in place of an opinion of Dr. Dews, undisputedly a treating source.  Rather, she reviewed and considered all the medical evidence in the record as was required.

When evaluating the claimant's RFC, the ALJ is not required to base her RFC findings entirely on physician opinions.  *See Rudd v. Comm'r of Soc. Sec*., 531 Fed. App'x 719, 728 (6th Cir. 2013) (quoting SSR 96-5p, 1996 SSR LEXIS 2) ("[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'"); *Brogan v. Comm'r of Soc. Sec*., 2017 U.S. Dist. LEXIS 38067, 2017 WL 1032520 at * 14 (N.D. Ohio March 16, 2017) ("An RFC determination is not the duty of a claimant's physicians; instead this determination is exclusively within the purview of the Commissioner."); *Peterson v. Comm'r of Soc. Sec*., 2017 U.S. Dist. LEXIS 9257, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017).

> The ALJ, not a physician, is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole.  42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 416.946(c).  Pursuant to the regulations, the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony.  *Webb v. Comm'r of Soc. Sec.,* 368 F.3d 629 633 (6th Cir.2004); SSR 96-5p, 1996 SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5.  The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 416.927(e)(2).

> The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence.  *See, e.g., Ford v. Comm'r of Soc. Sec.,* 114 F.App'x 194 (6th Cir. 2004); *Poe v. Comm'r of Soc. Sec.,* 342 Fed. App'x 149, 2009 WL 2514058, at (6th Cir. Aug.18, 2009).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 Fed. App'x 149, 2009 WL 2514058 at *7.

*Henderson v. Comm'r of Soc. Sec.,* 2010 U.S. Dist. LEXIS 18644, 2010 WL 750222 at * 2 (N.D. Ohio March 2, 2010).  *See also Peterson*, 2017 U.S. Dist. LEXIS 9257, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017); *Thomas v. Comm'r of Soc. Sec.,* 2016 U.S. Dist. LEXIS 177371, 2016 WL 7403743 at * 3 (N.D. Ohio Dec. 22, 2016) ("There is no requirement that the ALJ's RFC finding be based on the medical opinion of a physician.")  Moreover, it is well established that the claimant – and not the ALJ – has the burden to produce evidence in support of a disability claim.  *See, e.g., Wilson v. Comm'r of Soc. Sec*., 280 Fed. App'x 456, 459 (6th Cir.2008) (citing 20 C.F.R. § 404.1512(a)).  *See also Peterson v. Comm'r of Soc. Sec.,* 2017 U.S. Dist. LEXIS 9257, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017) ("It is not the ALJ's burden to seek out medical opinions to prove or disprove a disability claim.") (citing *Brown,* 602 Fed. App'x at 331).

I am aware of a separate line of cases stemming from Magistrate Judge Baughman's decision in *Deskin v. Comm'r of Soc. Sec.,* 605 F.Supp.2d 908 (N.D. Ohio 2008), holding:

> [A]s a general rule, [when] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.

*Id.* at 912.  Yet, even in Deskin, the court acknowledged that "[a] functional capacity opinion from a medical source may not be necessary in every case."

Hipp's core argument is that the ALJ was not permitted to make an RFC determination without a medical functional capacity opinion in the record.  Hipp does not argue that the ALJ misapplied the treating physician rule, failed to consider specific evidence in the record, or even that the RFC finding failed to incorporate all of his limitations.  Instead, he argues that the ALJ committed legal error by determining the RFC without a medical opinion.  The law does not

support Hipp's core argument – that an ALJ may never determine a claimant's RFC without a medical opinion. Rather, the law makes clear that it was Hipp, not the ALJ, who had the burden to produce evidence in support of his disability claim. *See, e.g., Wilson,* 280 Fed. App'x at 459, 20 C.F.R. § 404.1512(a)). It was "not the ALJ's burden to seek out medical opinions to prove or disprove a disability claim." *Peterson,* 2017 U.S. Dist. LEXIS 9257 at * 3. And, there is no requirement that an ALJ must, as a matter of law, seek out a physician's medical opinion when none is offered. *Brown,* 602 Fed. App'x at 331.

The ALJ was required to review all of the record evidence from the November 27, 2006 alleged disability onset date through June 30, 2010, Hipp's last date insured, to determine whether he was disabled during that time. She completed this review and issued her decision in June 2016. There is nothing to indicate Hipp ever requested that the ALJ re-contact his treating physicians or that she consult a medical expert in order to review the medical records. However, he argues that remand is required for that purpose. ECF Doc. 13, Page ID# 65-66.

The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, who is not a medical professional, may understand. *See Richardson v. Perales*, 402 U.S. 389, 408, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1972). The Commissioner's regulations provide that an administrative law judge "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404.1527(f)(2)(iii). The Commissioner's operations manual indicates that it is within the administrative law judge's discretion whether to seek the assistance of a medical expert. HALLEX I-2-5-32 (September 28, 2005). "The primary reason an ALJ may obtain ME opinion

is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind."  *Id.*  The operations manual indicates that an administrative law judge "may need to obtain an ME's opinion" in the following circumstances:

- the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;

- the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance;

HALLEX I-2-5-34 (September 28, 2005).  An administrative law judge's determination of whether a medical expert is necessary is inherently discretionary.  *Simpson v. Commissioner of Social Security,* 344 Fed.App'x 181, 2009 WL 2628355 (6th Cir. 2009) (unreported) at *8.  An ALJ abuses her discretion only when the testimony of a medical expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.  See 20 C.F.R. § 416.1444."  *See Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir. 1989).  Because discretion is involved, this court can remand only when there is reason to believe the ALJ abused her discretion by not enlisting the assistance of a medical expert.  Here, there is not.

The ALJ apparently concluded that an opinion from a medical expert was not necessary to determine Hipp's claim.  The record does not weigh against that decision.  The medical evidence contained two functional capacity evaluations by Hipp's physical therapists describing Hipp's physical abilities in 2008 and 2009.  (Tr. 24-25)  One of Hipp's treating physicians, Dr. Cohn, returned Hipp to work status with restrictions on May 27, 2009.  (Tr. 25, 173)  The diagnostic testing of Hipp's left knee and ankle showed only mild to moderate findings.  (Tr. 23, 25, 269, 278)  Notes from August 2009 indicated that Hipp was forcing himself to stay "fairly active" despite pain.  (Tr. 22, 252)  On May 4, 2010, Hipp reported to Dr. Seeds that he was able

19

to do all his normal daily activities with slightly less discomfort.  (Tr. 23, 227)  The record also indicated that Hipp had returned to light work during the relevant period.  (Tr. 23)

The parties do not dispute that Hipp was injured and physically limited during the relevant period.  But the record indicates that Hipp was capable of performing light duty work with the RFC restrictions found by the ALJ.  The ALJ supported her RFC finding with substantial evidence from the record, and correctly applied the agency's regulations.  She was not required, as a matter of law, to re-contact Hipp's treating physician or to obtain a medical expert to evaluate the medical records or to testify during the hearing.  I recommend that the court affirm the ALJ's decision.

## VII.   Recommendation

Substantial evidence supports the ALJ's decision in this action and Hipp has not identified any error of law.  I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: April 5, 2018

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**